# EXHIBIT B

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 1 of 23

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR CHAMBER OF BAYAMON

| | |
|---|---|
| CARMEN L. CAJIGAS HERNANDEZ | |
| Plaintiff | CIVIL ACTION NUMBER: |
| V. | |
| DAVOL, INC., C.R. BARD, INC., BARD SHANNON LTD., ANA SUAREZ NIEVES | **DEFECTIVE PRODUCT; INFORMED CONSENT** |
| Defendants | |

## COMPLAINT

**TO THE HONORABLE COURT:**

**THERE APPEARS** Carmen L. Cajigas Hernández, client [of] the undersigned

legal representation, and she very respectfully CLAIMS and REQUESTS:

### INTRODUCTION

1.    Ms. Carmen L. Cajigas Hernández (hereinafter referred to as Ms. Cajigas)

was initially admitted to the Doctor's Center Hospital, located in Bayamón,

Puerto Rico, on January 15, 2018, to have surgery because she was

presenting a ventral hernia. The operation was directed by Dr. Ana Suarez

Nieves. As part of the ventral hernia repair operation, a surgical mesh was

placed in the body of Ms. Cajigas by the name of Ventrio™ ST Hernia Patch

(LOT HUAV0200)(SKU/REF 5950030).

2.    On January 15, 2018 [sic], Ms. Cajigas was admitted to the Doctor's Center

Hospital, located in Bayamón, Puerto Rico, to have surgery because she was

presenting abdominal pain the same area affected by the operation on

January 15, 2018. The operation was directed by Dr. Ana Suarez Nieves.

As part of the ventral hernia repair operation, the Ventrio™ ST Hernia Patch

(LOT HUAV0200)(SKU/REF 5950030) surgical mesh was removed from

the body of Ms. Cajigas, and a new Ventrio™ ST Hernia Patch mesh was

1

[stamp:] RECEIVED DEC 03
2020 REICHARD & CALAF
P.S.C. [hw:] *P.O 2:45 p.m.*

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 2 of 23

placed in the body of Ms. Cajigas. At this time, the lot number for the mesh that was inserted on November 20, 2018, is unknown.

3.    During both surgeries, Dr. Ana Suarez Nieves only informed Ms. Cajigas that she would have to place mesh due to a problem with the hernia. Nothing else. As a result, a surgical mesh known as Ventrio™ ST Hernia Patch, from the company C.R. Bard, Inc., Davol, Inc., and Bard Shannon Ltd., was placed in the body of Ms. Cajigas on two occasions. (Hereinafter, for identification purposes, we refer to this surgical mesh that was placed in Ms. Cajigas' body as "Ventrio™ ST," "the mesh in question" or "the defective mesh").

4.    On January 16, 2019, Ms. Cajigas was admitted to the Doctor's Center Hospital, located in Bayamón, Puerto Rico, to have surgery because she was presenting clinical symptoms of seroma and a bacterial skin infection. All of the above in the same area of the previous operations. The surgery was directed by Doctor Norbert Correa Sardina. Ms. Cajigas was discharged on January 19, 2020, after being stabilized with battery of medications.

5.    Subsequently, in November 2019 [sic], Ms. Cajigas returned to the University Hospital, located in Rio Piedras, San Juan, Puerto Rico, to once again address additional complications she was presenting as a result of the aforementioned surgeries. In order to ultimately resolve her hernia situation, Ms. Cajigas submitted to an operation at the University Hospital. After the operation, she had a semi-private room at the University Hospital until December 5, 2020, and she was later referred home and assigned an in-home nurse.

2

## PARTIES

6.  The plaintiff Carmen L. Cajigas Hernández is of legal age and a resident of Guaynabo, Puerto Rico. We refer to her in this complaint as "Ms. Cajigas" or "Plaintiff." Her postal and physical address is: Urb. Ponce de León Calle 20, # 307 Guaynabo, PR 00969. Her phone number is: (787) 394-0777.

7.  Co-defendant Davol, Inc. (hereinafter referred to as "Davol") is a subsidiary of the Co-defendant C.R. Bard, Inc. (hereinafter referred to as "Bard"). Davol is a corporation in the state of Delaware that has its headquarters in the state of Rhode Island. Davol is a company that does business in all states and territories of the United States of America, including Puerto Rico. Its business is the research, development, design, manufacturing, production, marketing, sale and distribution of surgical meshes, including the defective mesh in question. Davol has intentionally wanted to have substantial contact with Puerto Rico doing business in Puerto Rico and receiving the benefit of doing business in this jurisdiction, which includes substantial economic benefits amounting to millions of dollars annually. Moreover, regardless of the foregoing, Davol knew that the mesh in question would be sold in Puerto Rico. Davol makes its sales and offers sales training from its Rhode Island headquarters and what is known as the "Davol Davol Biosurgery Surgical Education Program" is operated from its headquarters in Rhode Island.

8.  Co-defendant Bard Shannon Ltd. (hereinafter referred to as "Bard Shannon") is an Irish company, but registered to do business in Puerto Rico (Registration 10929) and a subsidiary of the Co-defendant Bard. Bard Shannon operates a factory in San Gerónimo Industrial Park Lot 1 Road 3 KM 77.5 Humacao, Puerto Rico, and was the company that manufactured, sold or distributed the defective mesh in question.

3

9.     Co-defendant Bard is incorporated and has its headquarters in the state of New Jersey, and the parent company and majority shareholder of Davol and Bard Shannon. Bard does business in all or almost every country in the world and is engaged in the development, manufacture, production, sale and marketing of medical equipment, including the defective mesh in question. Bard is the principal player in the hernia surgical mesh market in the United States and participates in the manufacture and distribution of surgical meshes, including the defective mesh in question. Bard supplies Davol and Bard Shannon with materials used in the manufacture of surgical meshes, including the defective mesh in question. Bard has been and is responsible for the actions of Davol and Bard Shannon as it has exercised control over Davol and Bard Shannon's actions to monitor and comply with regulatory safety standards that apply to surgical meshes sold in the United States and Puerto Rico, including the defective mesh in question. Bard has committed or has allowed to be committed numerous violations of manufacturing safety and quality control standards, and deviated from design and manufacturing specifications.

10.   Co-defendant Ana Suarez Nieves is a natural person and general surgeon (hereinafter referred to as Dr. Suarez). Dr. Suarez was the surgeon involved in the operation on Ms. Cajigas on two occasions. We believe Dr. Suarez has an office at: Hermanos Dávila Medical Building, Villa Rica C7B Office 102 Bayamón, PR 00959 and her phone number is (787) 798-3213.

11.   The defendants are jointly and severally liable for the damage suffered by Ms. Cajigas as a result of the design, manufacture, marketing, labeling, lack of adequate warnings, distribution, sale, and placement of the defective mesh in question on the market, either by them or through their agents, employees or owners, who acted at all times within their functions with real or apparent authority. The defendants are also vicariously liable for the acts

4

and omissions of their employees, who acted at all times within the functions of their employment.

**VENTRIO™ ST HERNIA PATCH:**
**DESCRIPTION, RISKS, COMPLICATIONS AND LACK OF INFORMED CONSENT**

12. The defective product in question known as Ventrio™ ST Hernia Patch (Ventrio™ ST) can be briefly described as a permanent self-impregnable mesh with bioresorbable coating for rebuilding soft parts with SORBAFLEX memory technology™. More specifically, VENTRIO™ ST is a partially resorbable, self-impregnable and sterile prosthesis with a bioresorbable coating that features two distinct layers of mesh sewn together with PTFE monofilaments[1] to form a placement pocket. The top layer consists of a polypropylene monofilament (PP) mesh,[2] while the bottom layer is a mesh made of the compound SEPRAMESH™ IP. The compound SEPRAMESH™ IP is woven with fibers of (PP) and polyglycolic acid (PGA) that results in a two-sided mesh, one side of PP and the other of PGA. The mesh is coated, on the PGA side, by a chemically modified and bioresorbable sodium hyaluronate hydrogel (HA), carboxymethyl cellulose (CMC) and polyethylene glycol (PEG). In theory, the face of the mesh fascia allows a rapid fibroblastic response through the interstitials of the mesh, which is supposed to allow the internal growth of the fabric towards the mesh. The visceral face of the mesh is a bioresorbable coating, which separates the mesh from the underlying tissue and surfaces of the organs to reduce the fixation or adhesion of the fabric to the mesh.

---

[1] Polytetrafluoroethylene (PTFE) better known as Teflon is a polymer similar to polyethylene, in which hydrogen atoms have been replaced by fluoride atoms. The chemical formula of the monomer, tetrafluoroethene, is $CF_2=CF_2$.
[2] The Polypropylene (PP) is the thermoplastic polymer, partially crystalline, obtained from the polymerization of propylene (or propene). It belongs to the polyolefins group and is used in a wide variety of applications including food packaging, fabrics, laboratory equipment, automotive components and clear films. It has great resistance against various chemical solvents, as well as against alkalis and acids

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 6 of 23

Shortly after placement, the biopolymer coating becomes a hydrated gel that is reabsorbed into place in less than 30 days. This medical device features SORBAFLEX™ memory technology, which is supposed to offer memory characteristics and stability to the mesh, making it easy to insert it initially, position it correctly and fasten it. SORBAFLEX™ memory technology refers to an extruded polydioxanone (PDO) monofilament component contained in a woven polypropylene mesh tube. The oval oversized patches include two separate PDO SORBAFLEX™ monofilaments. The PDO SORBAFLEX™ monofilament completely degrades *in vivo* through hydrolysis. The PDO monofilament has been found to produce an inflammatory response during absorption. In essence, the absorption is completed in about 6-8 months.

13. Ventrio™ ST is indicated for use as a reinforcement of soft tissue, when there is weakness, in procedures that require tissue repair, such as hernia repair. By nature, Ventrio™ ST is contraindicated for nursing mothers and children. It also cannot be used for the reconstruction of cardiovascular defects. Ms. Cajigas was not a child or a nursing mother at the time of the placement of the Ventrio™ ST in her body for the purpose of repairing an umbilical [sic] hernia.

14. The manufacturer of Ventrio™ ST has admitted that there are publications suggesting that the possibility of adhesion formation may exist when polypropylene is placed in contact with the intestines or viscera. Co-defendant Ana Suarez Nieves did not discuss these risks associated with placement of the Ventrio™ ST with Ms. Cajigas. Nor was Ms. Cajigas given written information at any time describing the risks associated with placing the Ventrio™ ST in her body. The only thing that Dr. Ana Suarez Nieves informed Ms. Cajigas about regarding the risks associated with the Ventrio™ ST was that mesh would be placed for a problem with the hernia that Ms. Cajigas was presenting. Nothing else. At no time were alternatives to surgical treatments or meshes discussed.

15. The manufacturer of Ventrio™ ST has admitted that among the possible adverse reactions to the product are seromas, adhesions, bruising, inflammation, extrusion, fistula formations, infection, allergic reaction and recurrence of the hernia or defect of soft tissues, as well as infection and intestinal or skin perforation. Co-defendant Ana Suarez Nieves did not discuss these possible complications associated with placement of the Ventrio™ ST with Ms. Cajigas. Nor at any time was Ms. Cajigas given written information describing the possible complications associated with placing the Ventrio™ ST in her body. The only thing that Dr. Suarez informed Ms. Cajigas about regarding the possible complications associated with the Ventrio™ ST was that mesh would be placed, nothing else. At no time were alternatives to surgical treatments or meshes discussed.

**VENTRIO™ ST HERNIA PATCH: A DEFECTIVE PRODUCT**

16.     Thousands of consumers have filed court and extrajudicial claims against Ventrio™ ST manufacturers under defective product theories.

17.     In the criminal proceedings <u>United States v. CR Bard. Inc.,</u> 848 F. Supp. 287 (D. Mass. 1994), the entity C.R. Bard, Inc plead guilty to 391 felonies. The federal court described the conduct in summary as follows: *"These are serious criminal violations. Bard knowingly and willfully kept adverse information from the FDA, made product changes that affected the safety or effectiveness of angioplasty catheters produced by its USCI Division without the required FDA approval, and illegally did testing on human beings without the required exemption from the FDA."*

18.     C.R. Bard and Davol have paid millions of dollars in compensation to consumers and patients who have filed court and extrajudicial claims alleging that the Ventrio™ ST is a defective product that caused harm.

19.     As discussed, Ventrio™ ST contains polypropylene. Manufacturers claim that polypropylene is chemically inactive or inert. However, scientific evidence shows that polypropylene is incompatible with human tissue and promotes an immune response in people who are exposed to polypropylene. The immune response, in turn, promotes the degradation and contraction of the Ventrio™ ST, as well as the surrounding tissue, and contributes to the development of adverse reactions.

20.     Entities that have supplied various forms of polypropylene to the defendant manufacturers of Ventrio™ ST warned that polypropylene should not be used in medical devices that were permanently implanted in the human body or that were in constant contact with human tissue or fluids.

8

21.  Ventrio™ ST is defective due to the high number of cases in which: (i) it fails, (ii) causes damage, (iii) causes complications and (iv) does not meet the intended objective. The foregoing often results, with unreasonable frequency, in the need for further surgery, which causes severe damage, as is the case with Ms. Cajigas.

22.  Some of the specific defects of Ventrio™ ST are:

a.  Polypropylene and immune reactions resulting from polypropylene use cause adverse reactions and damage.

b.  Immune reactions caused by polypropylene cause adhesions, damage to organs, nerves, blood vessels that are around the mesh. They also cause infections, chronic pain and recurrence of the hernia.

c.  It is prone to degrade and fragment over time, causing chronic inflation and fibrosis, resulting in continuous damage as polypropylene continues to act as a chronic catalyst for inflammation.

d.  The manufacturers are believed to have used polypropylene that is below generally accepted standards or have altered the polypropylene used in the polypropylene mesh placed in Ms. Cajigas' body.

e.  The polypropylene mesh fabric produces very small openings that allow bacteria to enter and hide from white blood cells and macrophages, which are the body's defenses designed to eliminate bacteria. Bacteria also secrete a biofilm that coats them, further protecting them from destruction by white blood cells and macrophages. In addition, some bacteria are able to degrade the polypropylene.

f. Polypropylene is always impure; there is no pure polypropylene. Polypropylene contains approximately 15 additional compounds that are filtered from the product and are toxic to tissue, increasing the inflammatory reaction and the intensity of fibrosis.

g. It has been observed through the use of electronic microscopes that polypropylene meshes are not inert. Mesh degradation results in detachment, cracks and release of toxic compounds. This enhances inflammatory and fibrotic reactions.

h. Polypropylene meshes were known to be shrinking by 30-50% in approximately 1998.

i. Polypropylene tends to oxidize as a result of the acids that are produced during the inflammatory reaction, causing degradation of polypropylene mesh.

j. The porosity of the mesh is important for the growth of the tissue, and the low porosity decreases the incorporation of tissue. Porosity also affects the inflammatory and fibrotic reaction. With mechanical stress, effective porosity decreases.

k. After being implanted in the human body, polypropylene is known to become depolymerized and suffer oxidative degradation by free radicals[3] and develop stress cracks.

l. The polypropylene surface promotes the absorption of liquids and bacteria, and is a "bacterial highway" that provides a safe haven for bacteria.

---

[3]The free radicals are formed in the middle of chemical reactions, from the homolytic rupture of a molecule and, in general, it is extremely unstable and therefore has great reactive power and a very short half-life (milliseconds).

    m. Common complications associated with polypropylene include restricted abdominal wall mobility and local wound abnormalities. Polypropylene failures often include persistent and active inflammatory processes, irregular or low formation of scar tissue, and poor mesh integration into the regenerative tissue area.

23.    The Ventrio™ ST used heavy polypropylene with small pores, which further promotes inflammation, foreign body reaction and subsequent complications.

### THE CIVIL LIABILITY OF THE MANUFACTURERS

24.    The manufacturers marketed the Ventrio™ ST when they knew or should have known that it was defective. The manufacturers had an obligation to know and disclose in a timely and appropriate manner the scientific and medical information about Ventrio™ ST, as well as to fully warn about its risks and side effects, but this was not done. The manufacturers also knew or should have known that Ventrio™ ST exposed consumers and patients to unreasonable risks of severe bodily harm and disproportionately to the potential benefits associated with using mesh, especially when viable and safe alternatives that did not present the same level of risk or complications were available. For marketing purposes, the manufacturers intentionally extolled the alleged benefits of Ventrio™ ST and in turn minimized or omitted its risks and adverse effects. The manufacturers knew their claims were false and misleading, and did not adequately disclose the true health consequences and true risks and adverse effects of Ventrio™ ST. Nor did the manufacturers give sufficient warnings or instructions on the level of risk, complications and danger posed by the use of Ventrio™ ST.

25. The risks of the Ventrio™ ST design outweigh any potential benefit associated with the design. As a result of its defective design and/or manufacture, an unreasonable risk of serious adverse complications may occur, including, among others: foreign body reaction; granuloma response; allergic reaction; rejection; erosion; excessive and chronic inflammation; internal organ adhesions; scarification; inadequate wound healing; infection; seroma; abscess; fistula; tissue damage and/or death; nerve damage; chronic pain; recurrence of hernia; and other complications. The manufacturers did not mention the risks, dangers, defects and disadvantages of Ventrio™ ST in their marketing, but however promoted, marketed, sold and distributed Ventrio™ ST as if it were reasonably safe. In turn, Ventrio™ ST manufacturers have stopped disclosing information about the mesh's tendency to fail and cause bodily harm as well as complications.

26. These actions and omissions by the mesh manufacturers were factors that substantially contributed to the serious damage suffered by Ms. Cajigas. Ms. Cajigas would not have agreed to the placement of the mesh in her body had the manufacturers disclosed all the consequences to her health, as well as all the risks and complications caused by Ventrio™ ST.

27. Ventrio™ ST manufacturers stopped making the following reasonable warnings:

    a. The propensity of Ventrio™ ST to degradation and fragmentation.

    b. The way and how quickly Ventrio™ ST erodes.

    c.  The risks of chronic inflammation.

    d.  The risks of chronic infection.

    e.  That the size of the mesh would drastically shrink once implanted.

    f.  Risk of hernia recurrence, hernia-associated pain and other mesh-associated pains.

    g.  The possible need for subsequent surgery.

    h.  The severity of possible complications.

    i.  The dangers associated with the mesh.

    j.  That mesh treatments can be just as effective as other treatments.

    k.  That mesh poses potential risks that are not present with other alternatives.

    l.  That future hernia treatment is more difficult and complicated when mesh has already been used.

    m.  Increased risk of further surgery.

    n.  That if there is a complication, removing the mesh completely could be medically impossible and can result in permanent complications, including chronic pain.

28.    Ventrio™ ST was implanted in Ms. Cajigas' body in a way that was foreseeable for the defendant manufacturers. Manufacturers published technical instructions for the implantation of these in the human body. That is why Ms. Cajigas has experienced great pain and suffering as a result of the defective mesh.

**THE APPLICABLE LAW OF DEFECTIVE PRODUCTS IN PUERTO RICO**

29.    In Puerto Rico, strict liability is imposed on the manufacturer, distributor and seller for damage caused by defective or dangerous products. Rivera v. Superior Pkg. Inc, 132 DPR 115, 125 (1992); Montero Saldaña v. Amer. Motors Corp., 107 DPR 452, 462 (1978); Ferrer v. General Motors Corp.,

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 14 of 23

100 DPR 246 (1971). Any person involved in the manufacturing and distribution chain is jointly and severally liable with the manufacturer to the injured person. See in this regard H. Brau del Toro, Torts and damages in Puerto Rico [Los daños y perjuicios extracontractuales en Puerto Rico], San Juan, Pubs. JTS (Jurisprudencia del Tribunal Supremo de Puerto Rico [Case Law of the Supreme Court of Puerto Rico]), 1986, Vol. II, Chap. XVI, p. 90.

30. The defective product is defined as a product that does not equal the average quality of similar products. Montero Saldaña v. Amer. Motors Corp., 107 DPR 452,462 (1978). The doctrine is based on the case that any person involved in the manufacturing and distribution chain is jointly and severally liable with the manufacturer to the injured person. Montero Saldaña v. Amer. Motors Corp., 107 DPR 452,462 (1978). The plaintiff does not have to provide proof of negligence by the manufacturer or seller, but must prove that the product was defective and that the defective product was the cause of the injuries suffered. Aponte v. Sears Roebuck de P.R., 144 DPR 830, 839 (1998).

31. The Supreme Court of Puerto Rico has approved the strict liability in torts rule, established by the California Supreme Court in the case of Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900 (Cal. 1962). There, Presiding Judge Traynor thus stated the rule: "...a manufacturer is strictly liable for damages when an item placed on the market, knowing that it will be used without an inspection for defects, demonstrates a defect that causes harm to a human being [and that] liability is not governed by the law of contractual guarantees but by the law of absolute liability for damages." The public policy underpinning the rule set out in that case is that "the purpose of such liability is to ensure that the cost of damage resulting from defective products is borne by the manufacturers who shipped such products to the

14

market rather than the affected persons who are powerless to protect themselves." <u>Aponte v. Sears Roebuck,</u> *supra.* The manufacturer or seller is responsible for defects of their product, provided that the injured party uses it for use that is reasonably foreseeable by the manufacturer. <u>Aponte v. Sears Roebuck,</u> *supra.*

32.     According to case law, in the field of product liability, there are three (3) types of defects that give room for the application of the doctrine of strict liability. These are: manufacturing defects, design defects and insufficiency defects in warnings or instructions. <u>Aponte v. Sears Roebuck</u>, *supra.* Regarding design defects, the California Supreme Court developed an analysis, or "test," of two alternatives. Thus, the plaintiff will prevail in a design defect case if it demonstrates that: "(1) the product failed to behave as safely as an ordinary consumer would have expected when using the product for which it was intended or for which it could predictably be used, or if he demonstrates that, (2) [a] the design of the product was the proximate cause of the damage and [b] the respondent did not prove that on the balance of interests, the benefits of the design in question outweigh the risks of the danger inherent in the design." Under the second alternative, the burden of proof that the benefits of the design used outweigh the risks inherent in it is shifted to the manufacturer. <u>Aponte v. Sears Roebuck</u>, *supra.*

33.     With regard to manufacturing defects, the Supreme Court of Puerto Rico adopted the definition of "defect" suggested by the then Presiding Judge Traynor, in the case of Greenman v. Yuba Power Products Inc, supra, to the effect that "a defective product may be defined as one that fails to match the average quality of similar products and the manufacturer is then liable for damages resulting from deviations from the standard." <u>Mendoza v. Cervecería Corona. Inc.,</u> 97 DPR 499, 512 (1969).

15

34. In the third type of defect, even if a product does not suffer from manufacturing or design defects, it is considered defective if the manufacturer or seller does not offer the user or consumer those warnings or instructions that are appropriate regarding the dangers or risks inherent in the handling or use of the product. This duty extends to all uses of the product that are reasonably foreseeable by the manufacturer. Failure to warn exposes the manufacturer to liability, if the manufacturer knew, or should have known, of the danger or risk involved, and the need to give the warning to ensure the safest use of the product. Aponte v. Sears Roebuck, supra.

35. It has been established that where there is a dispute over the defects of a product, it is necessary to use expert evidence to establish the element of defectiveness, at least when it is not an obvious defect. Randolph v. Collectramatic, Inc., 590 F.2d 844, 848 (10th Cir. 1979); Huddell v. Levin, 537 F.2d 726, 736 (3rd Cir. 1976).

36. As a result of the coordinated activities of all the defendants mentioned above, a defective medical hernia mesh was implanted in the body of the claimant. The defendants are jointly and severally liable for the damages of the plaintiff caused by the manufacture, design, marketing, distribution, sale and placement of a defective surgical mesh directly or indirectly through their employees, contractors or agents in the ordinary course of their business activities.

37. It is alleged that the defendants had a legal duty to ensure the effectiveness and safety of the surgical mesh through valid and controlled studies before marketing them. It is believed that the studies that were done might have been deliberately manipulated, resulting in information.

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 17 of 23

38.   The defendants emphasized at all times that the surgical mesh was a safe and effective product. However, the surgical mesh that was designed and/or manufactured was not reasonably safe for its purpose, containing and repairing a hernia, and the risks associated with the design exceeded the potential benefits of that design. As a result of the design and/or manufacture of the surgical mesh, there was an unreasonable risk of the following adverse reactions to mesh or mesh components: chronic pain, hernia recurrence, to foreign body reaction; rejection, infection, insufficient or failed incorporation; migration, mesh deformation; insufficient or inappropriate healing, excessive and chronic inflammation; adhesion to other organs; erosion, abscess, fistula formation, granuloma, seromas, nerve damage, tissue damage and/or death, as well as other complications. The medical documents in the possession of the hospital and defendant surgeon confirm that the plaintiff experienced several of these symptoms and that her body rejected the defective mesh.

39.   The hernia surgical mesh is thought to have been designed and/or manufactured in such a way that it lacked enough strength to tolerate normal abdominal efforts, resulting in recurrence of the hernia.

## LACK OF INFORMED CONSENT

40.   Co-defendant Ana Suarez Nieves was not in the same position as the mesh manufacturers to know, and therefore inform, Ms. Cajigas about all possible complications, risks and dangers of the mesh.

41.   However, the co-defendant manufacturers did publish information on possible mesh risks and complications, as described in paragraph 13 and 14 of this complaint.

42. There is information published by manufacturers about the risks and complications of mesh, despite the fact that it is incomplete, inaccurate and misleading.

43. Co-defendant Ana Suarez Nieves did not share the information about the risks and complications that was available and that had been published by the mesh manufacturers with Ms. Cajigas.

44. The only thing that co-defendant Ana Suarez Nieves informed Ms. Cajigas about regarding the risks and possible complications associated with the Ventrio™ ST was that mesh would be placed, nothing else. Nothing else. At no time were alternatives to treatments or alternate surgical meshes discussed.

45. Co-defendant Ana Suarez Nieves did not make a faulty disclosure, but she completely failed to inform of the possible risks and complications. Alternatively, the disclosure was not made in line with the comprehension capacity of Ms. Cajigas.

46. Ms. Cajigas, not having *any* information about the potential risks or complications associated with it, was not in a position to give informed consent.

47. When Ms. Cajigas was admitted to the Doctor's Center Hospital, the only thing that Ms. Cajigas was informed about was that mesh would be placed. At no time were the nature and objectives of the treatment, the benefits, the alternatives of the same, the risks and the possibility of complications discussed. Alternatively, if Ms. Cajigas signed anything in her moment of pain at the hospital, what she signed was a generic form that did not mention the treatment in question, much less make reference to alternatives, risks or complications associated with the operation she was undergoing; not the surgical mesh that would be placed in her body. If there is any document, it

18

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 19 of 23

does not constitute an exposition of treatment, alternatives and risks of complications, but a generic and stereotypical form.

48. Ms. Cajigas does not believe that co-defendant Ana Suarez Nieves acted out of malice, but she did proceed without her informed consent. There were no legitimate medical reasons to proceed in a hasty manner and without the informed consent of Ms. Cajigas. Ms. Cajigas certainly felt pain, but she was perfectly able to understand minimal information about the mesh that would be placed on her body, the possible risks and complications according to the manufacturer, and the treatment alternatives. However, the only thing that was said to Ms. Cajigas was that a mesh would be placed to address a problem with the hernia.

49. Patient consent is an indispensable element in carrying out a surgical medical procedure, treatment or medical procedure that is invasive to the human body, except for exceptional emergencies and damage to the psychological state of patient apprehension. In order for this essential criterion to be understood to be met in cases of medical negligence, in addition to obtaining the express consent of the patient, it is necessary that such consent be informed. Rojas v. Maldonado, 68 D.P.R. 818, 827 (1948).

50. The legal basis for such a requirement is that all people have the constitutional right to decide freely over their bodies. As a corollary to such a right, the courts have repeatedly held that doctors have an obligation to obtain informed consent from their patients prior to any treatment or surgery. The term informed consent imposes on physicians a duty to provide their patients with all the information that is essential to understand the nature of a certain procedure, which should include data on benefits, risks and possible complications. Martínez Marrero v. González Droz, 180 D.P.R. 579, 593 (2011)

19

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 20 of 23

51.     Generally, on this topic, the controversy centers on how much information the doctor must give the patient so that the patient's consent is not flawed or is sufficient to make an intelligent decision. The case law of the Supreme Court of Puerto Rico has reiterated that the physician must disclose both the reasonably foreseeable risks and the benefits of an invasive treatment or procedure. He must also provide available alternatives and the likely risks in case the patient chooses not to treat the condition. This was reiterated by the high court in Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 663-664 (1988). In that opinion, the court proposed as a simple and clear rule the following:

> The doctrine of informed consent imposes a duty on the physician to inform the patient about the nature and risks of proposed medical treatment so that the patient is in a position to make an intelligent and informed decision.
> Id., 121 D.P.R., on page 664.

52.     The risks associated with the mesh in question were widely known through countless reports, publications and *thousands* of civil claims that had been filed across the United States and internationally. See, for example, In Re: Davol, Inc./C.R. Bard. Inc., Polypropylene Hernia Mesh Products Liability Litigation, 2:18-md-2846 The reasonable medical surgeon dedicated to placing surgical meshes would have been aware of these important developments. Given the number of victims of the mesh in question, a reasonable professional would have warned of risks, as these were not remote, but likely based on the scientific literature and the number of patients who have some form of complication after the placement of a mesh containing polypropylene, both at the national level and in the Puerto Rico medical community. Had she been informed, Ms. Cajigas would not have consented to the surgical mesh in question being placed in her, but would

have explored other alternatives, including other brands and models of surgical mesh.

53.  As a result of the defendants' negligent actions and omissions, the plaintiff suffered physical harm and severe mental distress. Aside from the invasion in her body several times, as described, she has suffered multiple complications that have lasted several years, until leaving the hospital on December 5, 2019, and the complications and pain of which still also last today. Furthermore, and regardless of the above, any dilation of Ms. Cajigas in taking action with this court is imputable to co-defendant Ana Suarez Nieves, who never informed Ms. Cajigas about the nature of the procedure and its possible complications.

54.  At this time, Ms. Cajigas continues to suffer from pain in the same area; therefore, the scope of the damages still cannot be fully quantified. The history of pain and suffering is still not over for Ms. Cajigas.

55.  Likewise, as a result of these events, Ms. Cajigas and/or her health insurance has suffered economic damages in an amount no less than $21,994.17 as of March 19, 2019, according to the breakdown in the attached exhibit, which should be reimbursed to her and/or the government. Due to the situation of COVID-19, it has not been possible to obtain an updated itemization of costs, so a request will be sent later to amend the request in order to include additional expenses incurred.

**THEREFORE,** the plaintiff requests that all defendants be held liable, jointly and severally, for the physical, emotional and economic damages suffered, including medical expenses, and all attorney costs and fees to the fullest extent permitted by law and in accordance with the evidence presented, for an amount no less than one million dollars.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on December 2, 2020.

s/Zuleika Castro De Jesús
Attorney Zuleika Castro De Jesús
PR Bar No.: RUA (*Registro Único de Abogados y Abogadas* [Unique Register of Attorneys])-21258
FL Bar No.: 1022294
D'Jesus Law Offices
1969 S. Alafaya Trail #379
Orlando, FL 32828-8732
zcastro@djesuslaw.com
Phone: (407) 267-7130
Fax: N/A

s/José Carlos Vélez Colón
Attorney José C. Vélez Colon

RUA 18913
421 Ave Muñoz Rivera
10th floor
jvelez@velezlawgroup.com
Phone: (787) 599-9003
Fax: N/A

22

BY2020CV03827 12/02/2020 01:45:30 a.m. Submission No. 1 Page 23 of 23

**PROOF OF NOTICE**

**I CERTIFY** that I submitted this brief through the SUMAC (*Sistema Unificado de Manejo y Administración de Casos* [Unified Case Management and Administration System]) system, which will notify all attorneys of record.

Date: December 2, 2020.

s/José Carlos Vélez Colón
Attorney José C. Vélez Colon
RUA 18913
421 Ave Muñoz Rivera
10th floor
San Juan, PR 00918
jvelez@velezlavvgroup.com
Phone: (787) 599-9003
Fax: N/A



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Hernandez, Carmen L. Cajigas -**
**Complaint (Spanish Version)**" is, to the best of my knowledge and belief, a true and
accurate translation from Spanish into English.

_____
Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
December 8, 2020

_____
Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public